IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANDREW M. OBREGON,

                Plaintiff,

v.

RADU FILIPESCU and JAIME BARKER,

                Defendants.

OPINION and ORDER

23-cv-681-jdp

---

    Plaintiff Andrew M. Obregon, proceeding without counsel, alleges that defendants Dr. Radu Filipescu and Jaime Barker denied him medical care for his persistent low back pain while he was incarcerated at Stanley Correctional Institution. Obregon also alleges that Barker retaliated against him by canceling his medical restriction allowing him to wear high-top boots. Obregon proceeds on Eighth Amendment medical care and Wisconsin-law medical negligence claims against both defendants, and a First Amendment retaliation claim against Barker.

    Defendants move for summary judgment. Dkt. 51; Dkt. 56. The evidence shows that Filipescu investigated Obregon's medical history and decided that a more intense course of physical therapy was appropriate treatment for Obregon's low back pain. The evidence also shows that as the health services manager Barker was not responsible for treating Obregon, and she had to defer to Filipescu's treatment plan. As for the retaliation claim, the evidence shows that it was another doctor, not Barker, who canceled Obregon's medical restriction. I will grant defendants' motions on Obregon's federal claims, and I will relinquish jurisdiction over his state-law claim. I will deny Obregon's motions for leave to amend his complaint and for sanctions. Dkt. 82 and Dkt. 84.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

Obregon has been in Department of Corrections custody since 2015. On March 10, 2022, Obregon was transferred from Columbia Correctional Institution (CCI) to Stanley Correctional Institution (SCI). Defendant Radu Filipescu was a doctor at SCI; defendant Jaime Barker was the health services manager. The main events occurred while Obregon was at SCI, but care he received at CCI provides context for his claims against Filipescu and Barker.

## A. Care provided at CCI

In late April 2021, Obregon submitted a health services request (HSR) in which he complained of low back pain. In early July 2021, Dr. Gilbert Steffanides noted that Obregon rolled his ankle and fell on the stairs, which increased his back and tailbone pain. Later that month, Obregon had his first session with physical therapist Nathaniel Bothfeld for low back pain, at which he received a home exercise program. Dkt. 57-1 at 31–33. Obregon had two more sessions with Bothfeld for the same problem in August and September 2021. *Id.* at 27, 30. After the third session, Bothfeld discharged Obregon and referred him back to an advanced care provider. Bothfeld noted that he could not explain the source of Obregon's back pain because Obregon had been diligent with his home exercise program and had full strength and range of motion. *Id.* at 27.

In December 2021, Dr. James Murphy ordered an MRI for Obregon's low back. The MRI showed severe degenerative disc disease and at least mild to moderate facet arthropathy in Obregon's lower back, but minimal disc impingement on his nerve roots. *See id.* at 43.

In February 2022, Murphy treated Obregon with a one-week trial of tramadol in response to his complaints of low back pain, and he noted that he would apply for longer-term

2

usage. Tramadol is an opioid medication that is difficult to administer in a prison setting and should not be used chronically. In early March 2022, Obregon complained that tramadol wasn't helping his lower back pain. Dkt. 57-1 at 62.

## B. Care provided at SCI

When Obregon was transferred to SCI in March 2022, he started writing HSRs and other requests in which he complained about serious low back pain and asked to see a doctor. Dkt. 73-2; Dkt. 73-3.

Nurse Jean Felber messaged Dr. Joan Hannula and physical therapist Jered Kuehn. Dkt. 57-1 at 46. Felber noted that Obregon was being treated with tramadol for low back pain and asked them to review his history and decide how to proceed. The next morning, Kuehn replied that Obregon had received a "well rounded course" of physical therapy for his lumbar spine, pelvic floor, and ankles in the past 6 months at CCI. *Id.* Kuehn recommended scheduling an epidural steroid injection. *Id.* Dr. Hannula did not approve tramadol. *See id.* at 45–46.

In early July 2022, an offsite pain management specialist, Dr. Cary Effertz, saw Obregon. Effertz noted that Obregon had irritation or inflammation of a nerve root in the lower back that can cause pain, numbness, and tingling. Effertz recommended an epidural steroid injection, and a trial of tramadol or methocarbamol.

On July 19, 2022, Filipescu was notified that Effertz had recommended a steroid injection and asked him whether he authorized it. Filipescu reviewed Obregon's medical file and determined that pain was his chief complaint, not numbness or tingling in his low back or legs. Dkt. 57 ¶ 11. Filipescu declined to schedule Obregon for a steroid injection, deciding to continue Obregon on ibuprofen and acetaminophen and to order a second course of physical therapy. Filipescu planned to follow up with Obregon after his physical therapy sessions to

determine what steps to take next if his low back pain continued. But Filipescu left SCI in mid-September 2022, and Obregon wasn't scheduled for physical therapy until after Filipescu's departure. Filipescu had no further involvement in Obregon's care.

Obregon submitted an HSR on August 22, 2022, asking to see a doctor for his back because he was in "a lot of pain." Dkt. 73-2 at 32. That request was answered a day later, apparently by Barker. *Id*. The responding staff member, whose signature resembles "J Barker," wrote that he had an appointment to see a doctor. Dr. Laura Sukowaty saw Obregon in mid-December 2022. Dkt. 53-2 at 126.

As recommended by Filipescu, Obregon had six physical therapy sessions with Kuehn. After those sessions, Kuehn told Sukowaty that Obregon was having constant low back pain and intermittent paresthesia even though he had normal lower extremity strength. Dkt. 57-1 at 7. Kuehn suggested that a steroid injection could be helpful, and Sukowaty ordered that treatment. *Id.* at 6.

Obregon received epidural steroid injections for low back pain in February 2023, February 2024, March 2024, and a sacroiliac joint injection for the same problem in June 2024. Dkt. 53-2 at 158–59, 167–68, 179–80, 369. (It's unclear whether the joint injection involved a steroid or anesthetic.) Obregon continued to complain of serious back pain after these injections, though he reported moderate improvement a week after the February 2024 injection. Dkt. 75 ¶¶ 65, 110, 119, 131, 165; Dkt. 53-2 at 117. Multiple professional medical organizations have published guidelines stating that epidural steroid injections are generally ineffective for low back pain. *See* Dkt. 57-2; Dkt. 57-3; Dkt. 80 ¶ 41.

**C. Care related to the retaliation claim against Barker**

In 2019, an offsite podiatrist diagnosed Obregon with tenosynovitis (ankle tendon inflammation) due to flat feet, which caused heel pain. *See* Dkt. 73-4 at 2. The podiatrist recommended high-top boots for work and tennis shoes with inserts and ankle braces for other activities. *See id.* at 2–3. In July and August of that year, medical restrictions were entered stating that Obregon could purchase high-top boots from an outside vendor if approved by security, and that he could wear mid- or high-top tennis shoes to accommodate his orthotics. Dkt. 73-5 at 1–2. In October and November 2019, an offsite provider recommended that Obregon be allowed to wear shoes from an outside vendor, and he received custom insoles from an orthotist the next month. *See id.* at 4–5. Obregon didn't receive high-top boots at CCI, and it's unclear whether he obtained high-top tennis shoes from an outside vendor while there.

In mid-March 2022, while at SCI, Obregon submitted an HSR in which he stated that he had an order for high-top boots at CCI and asked how to obtain them. Dkt. 53-2 at 297. Nurse Kathie Klinger-Berg responded that she sent his request for boots to the special needs committee. Obregon submitted a similar HSR three weeks later. Dkt. 73-2 at 9. On April 7, 2022, nurse Casey Dorn responded that, per SCI policy, alternate shoes had to be approved by Barker. *Id.* Dorn advised Obregon to wait for a response. *Id.* On April 19, 2022, Dorn emailed Dr. Fern Springs. Dkt. 74-4 at 19. Dorn wrote that after Obregon's transfer to SCI, Barker and Kuehn reviewed his file because he had "previous restrictions for 'ok to wear personal shoes as state,' and 'Apex' medical shoes." *See id.* Dorn continued, "SCI staff feel State Black Velcro and Freedom [orthotics] are appropriate at this time. Would it be ok to remove these restrictions?" *Id.* A day later, Springs authorized the removal of the footwear restrictions. *Id.*

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

A. **Preliminary matters**

Obregon moves for leave to amend his complaint. Dkt. 82. I will deny this motion for the reasons that I denied Obregon's similar motion filed a few weeks earlier. Dkt. 64. Obregon would have to pursue his claims against new defendants based on new events in a separate lawsuit. Obregon also moves for sanctions, contending that Barker lied in her declaration. Dkt. 84. I will deny this motion because ordinary factual disputes are not a basis for sanctions.

B. **Eighth Amendment medical care claims**

Obregon proceeds against Filipescu based on the allegation that he refused Effertz's recommendation for a steroid injection and ordered physical therapy even though he knew that this treatment had previously proven ineffective for his serious low back pain. *See* Dkt. 20 at 3–5. Obregon proceeds against Barker based on the allegation that she knew that he had gone ten months without seeing a provider and didn't try to expedite an appointment even though she knew that his pain medication was ineffective for his low back pain. *Id.* at 4.

The Eighth Amendment prohibits prison officials from consciously disregarding the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish a medical care claim, Obregon must show that he had an objectively serious medical condition that defendants consciously disregarded. *See Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017). Obregon's persistent, serious low back pain is a serious medical condition. *See Walker v. Benjamin*, 293 F.3d 1030, 1039–40 (7th Cir. 2002); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).

The issue is whether defendants consciously disregarded this condition. Conscious disregard requires that defendants are subjectively aware of that need. *Cesal*, 851 F.3d at 721. That means that defendants knew of facts from which the inference could be drawn that a substantial risk of serious harm existed, and they actually drew that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Conscious disregard involves intentional or reckless conduct, not mere negligence. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

The Eighth Amendment entitles prisoners to "adequate medical care," that is, "reasonable measures to meet a substantial risk of serious harm." *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). But the Eighth Amendment doesn't require "specific care" or "the best care possible." *Id.*; *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Disagreement between Obregon and defendants, or disagreement among medical professionals, about the proper course of treatment isn't enough to show conscious disregard. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996).

Ignoring a prisoner's request for medical assistance outright can be enough to show conscious disregard of a medical need. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc). If a medical professional has provided some care for a prisoner's condition, the professional consciously disregards the serious medical need only if the care is so inadequate that it demonstrates an absence of professional judgment, that is, that no minimally competent professional would have responded in that way in the circumstances. *See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021); *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998). If a professional provides some care, a prisoner meets the conscious disregard standard by showing that the medical professional persists in a course of treatment that he knows is ineffective, or chooses an easier and less effective treatment without

7

exercising professional judgment. *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011).

Obregon must also show that the deprivation of medical care actually injured him. *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019).

### a. Eighth Amendment claim against Filipescu

The evidence shows that Filipescu based his treatment decisions on his medical judgment. When notified that Effertz had recommended an epidural steroid injection, Filipescu reviewed Obregon's medical file and determined that Obregon's chief complaint was low back pain, not numbness or tingling in his low back or legs. This determination was reasonable based on Obregon's treatment history. Obregon's electromyography from August 2020 was normal, Murphy didn't note numbness or tingling at Obregon's December 2021 and February 2022 visits, and the MRI showed only minimal disc impingement on his nerve roots. Dkt. 57-1 at 1–2; Dkt. 80 ¶ 38.

It's true that Effertz noted in July 2022 that Obregon's pain radiated down his thighs. Dkt. 57-1 at 8. But Filipescu's disagreement with her findings, even if mistaken, wouldn't show conscious disregard. Based on his determination that Obregon's primary symptom was low back pain, Filipescu believed that another course of physical therapy was appropriate treatment, and he ordered that treatment. Filipescu had planned to review Obregon's physical therapy sessions to determine what steps to take next if his low back pain continued, but his responsibility for Obregon's care ended when he left SCI, before Obregon had received the physical therapy.

Filipescu also continued Obregon on ibuprofen, which is a first-line medication for low back pain, and acetaminophen. Dkt. 80 ¶ 47. Filipescu had a reasonable basis to believe that

8

these less aggressive treatments were providing some relief for Obregon despite his complaints of persistent pain: he regularly requested refills of them from the time he arrived at SCI. *Id.* ¶¶ 52–53.

Obregon contends that Filipescu knew that physical therapy would be ineffective because he received five to six months of physical therapy for his low back without success. *See* Dkt. 68 ¶ 4. But Obregon did not receive five to six months of physical therapy for his low back pain. Obregon's medical records show that he had three physical therapy sessions with Bothfeld for low back pain between mid-July and mid-September 2021. Obregon includes physical therapy sessions that he received for foot and ankle pain. *See* Dkt. 57-1 at 36; Dkt. 73-4 at 8. The three sessions for low back pain and Obregon's home exercise program were unsuccessful, and Kuehn believed that he had received an adequate trial physical therapy for that problem. But Filipescu believed that three sessions targeting Obregon's low back pain were not enough and that he "could benefit from a more consistent and intense therapy regimen." Dkt. 57 ¶ 21. Filipescu's disagreement with the Kuehn's opinion about the effectiveness of additional physical therapy doesn't show Filipescu's conscious disregard.

Obregon also faults Filipescu for declining the specialist's recommendation for an epidural steroid injection. But multiple professional medical organizations have published guidelines stating that this treatment is generally ineffective for low back pain. As it turned out, Obregon later received four injections for low back pain that proved mostly ineffective, or even counterproductive. Obregon had such severe pain after the March 2024 injection that he required a trip to the emergency room. Dkt. 75 ¶ 124. Filipescu declined Effertz's recommendation for a steroid injection based on his medical judgment, not out of conscious disregard for Obregon's medical care. *See Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018)

9

("Failing to provide care for a *non-medical reason*, when that care was recommended by a medical specialist, can constitute [conscious disregard of medical needs]." (emphasis added)); *see also Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018) (stating that a prison doctor doesn't always have to follow the recommendation of a specialist).

Obregon also faults Filipescu for not ordering a different pain medication, but Obregon doesn't have a right to the treatment of his choice. The evidence shows that Filipescu believed that Obregon's problem was primarily mechanical and was appropriately treated with over-the-counter pain medication and more intense physical therapy, and the evidence supports his belief that his treatment plan was within "accepted professional standards." *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Many people in the community manage similar chronic low back pain without resorting to more aggressive treatment. Even if Filipescu's plan ultimately proved unsuccessful, the Eighth Amendment right to medical care "does not guarantee a cure." *Stechauner v. Murphy*, No. 17-cv-221-jdp, 2018 WL 1785497, at *2 (W.D. Wis. Apr. 13, 2018).

No reasonable juror could conclude that Filipescu consciously disregarded Obregon's low back pain. I will grant summary judgment to Filipescu.

### b. Eighth Amendment claim against Barker

Obregon alleges that Barker knew that he had gone ten months without seeing a provider and didn't try to expedite an appointment even though she knew that his pain medication was ineffective for his low back pain. The evidence does not support this allegation. Obregon started submitting requests for treatment for his back pain when he arrived at SCI, but Barker was aware of only one of them, which she received in late August 2022. Obregon asked to see the doctor because he was in "a lot" of back pain, and Barker noted that he already

had an appointment. Obregon faults Barker for not expediting the appointment, but his request to see a doctor was not urgent, and Filipescu had already ordered physical therapy a month earlier.

Barker says that, as the health services manager, she is responsible for the professional management of medical services and provides overall administrative support and direction of the health services unit. Dkt. 53 ¶ 4. Unlike nursing staff and advanced care providers, the health services manager usually does not provide direct medical care to prisoners, and she lacked the authority to override or change a provider's medical decision. *Id.* ¶¶ 5, 7. Obregon says that Barker was responsible for his treatment and could have ordered different care, but his evidence, Barker's position description, confirms that her position was primarily managerial and administrative. *See* Dkt. 73-9 at 7–14. It's undisputed that Barker lacked the authority to override or change Filipescu's medical decisions. *See Pulera v. Sarzant*, 966 F.3d 540, 553 (7th Cir. 2020) (holding that nurses were entitled to defer to a doctor's medical judgment to deny a prisoner medications).

No reasonable juror could conclude that Barker consciously disregarded Obregon's low back pain. I will grant summary judgment to Barker on this claim.

## C. First Amendment retaliation claim

Before he got to SCI, Obregon had a medical restriction that would have allowed Obregon to order and wear high-top boots or shoes. Obregon proceeds on a retaliation claim against Barker based on the allegation that she canceled his footwear restriction because he complained about a lack of medical treatment. Dkt. 20 at 5.

To prevail on a retaliation claim, Obregon must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter future

First Amendment activity; and (3) the protected activity was at least a motivating factor in defendants' decision to take the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). For purposes of summary judgment, Barker doesn't dispute that Obregon can meet the first two elements. *See* Dkt. 54 at 12. The issue is the third element, causation. Barker denies that she cancelled the medication restriction because Obregon had requested for accommodations for his foot and ankle problems.

I will assume, for purposes of this motion, that Barker was aware of the March and April 2022 HSRs in which Obregon asked for high-top boots. But the evidence shows that Dorn told Dr. Springs about these requests, and that it was Springs who canceled Obregon's footwear restriction. Obregon's requests for high-top boots could not have caused Barker to cancel his restrictions for them because Barker did not take that action. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (stating that individual liability under 42 U.S.C. § 1983 "requires personal involvement in the alleged constitutional deprivation")

Obregon contends that Barker participated in the decision to cancel the restrictions because Springs relied on Barker's input. But Dorn, not Barker, directly told Springs that Barker did not think the restrictions were necessary, and Barker hadn't canceled them before Dorn gave Springs that information. The evidence does not support Obregon's allegation that Barker sought to cancel the restrictions herself or that she asked anyone else to take that step.

Even if Barker had participated in the cancelation of the footwear restriction, there's no evidence that the decision was retaliatory. At most, the evidence shows that SCI staff believed that state-issued black Velcro shoes and Freedom orthotics were appropriate for Obregon's foot and ankle problems, and that high-top boots weren't necessary. Kuehn agreed with this determination, and the recommended footwear was later ordered. Dkt. 75 ¶¶ 20, 60. Also,

12

there's no evidence that Obregon ever used high-top boots at CCI, which would have given Barker more reason to believe that the alternative was appropriate.

No reasonable juror could find that Obregon's requests for high-top boots were a motivating factor in the decision to cancel the his footwear restrictions. I will grant summary judgment to Barker on Obregon's retaliation claim.

### D. State-law medical negligence claim

Without the federal claims, the court would not have jurisdiction over Obregon's medical negligence claim on the basis of diversity because there's no evidence that he has different citizenship than Filipescu and Barker. *Cf.* Dkt. 1 at 1–2; Dkt. 17 at 2.

When all federal claims have been dismissed, the general practice in federal court is to decline to exercise supplemental jurisdiction over the related state-law claims. *See Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). I'll follow that practice here and relinquish jurisdiction over Obregon's medical negligence claim without evaluating its merits.

Obregon may pursue his medical negligence claim in state court, subject to Wisconsin statutes of limitations (and other potentially applicable procedural bars). Those limitations periods have been tolled while this case has been pending, but they will begin again 30 days from now. *See* 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under [the court's supplemental jurisdiction] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.").

ORDER

IT IS ORDERED that:

1. Defendant Jaime Barker's motion for summary judgment, Dkt. 51, is GRANTED.

2. Defendant Radu Filipescu's motion for summary judgment, Dkt. 56, is GRANTED.

3. Jurisdiction is relinquished over plaintiff Andrew M. Obregon's Wisconsin-law medical negligence claim.

4. Plaintiff's motion to amend, Dkt. 82, is DENIED.

5. Plaintiff's motion for sanctions, Dkt. 84, is DENIED.

6. The clerk is directed to enter judgment and close the case.

Entered April 17, 2025.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge